**In re CIVIL SERVICE CHARGES AGAINST PIPER.**

[Cite as *In re Civ. Serv. Charges Against Piper* (2001), 142 Ohio App.3d 765.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 18336.

Decided May 18, 2001.

*J. Rita McNeil,* Dayton Law Director, and *Deirdre Logan,* Chief Prosecutor, and *John J. Scaccia,* Chief Administrative Counsel, for appellee, city of Dayton.

*Richard Hempfling,* for appellant, Donald C. Piper.

---

BROGAN, Judge.

This case involves an appeal of disciplinary action taken against Officer Donald C. Piper regarding an incident that occurred on July 9, 1996. As a result of this incident, Piper was suspended for thirty-five days. He appealed this finding to the civil service board where a hearing officer upheld the suspension, and the board affirmed. Subsequently, Piper appealed to the common pleas court, which also affirmed the suspension. Piper has now appealed to this court, raising the following assignments of error:

"I. The trial court erred in determining that it lacked jurisdiction to consider the time limits for taking disciplinary action set forth in the F.O.P. contract.

"II.    The trial court's judgment is against the manifest weight of the evidence."

■■■    For ease of discussion, we will address the second assignment of error first.    In this assignment, Piper alleges that the trial court's decision upholding his suspension was against the manifest weight of the evidence.    In an appeal based on R.C. 124.34, the trial court is required to conduct a *de novo* review of the civil service proceedings.    *Hall v. Johnson* (1993), 90 Ohio App.3d 451, 454, 629 N.E.2d 1066, 1068–1069.    However, the court of appeals' review is the same as in any civil appeal.    *Id.*    The court of appeals can only reverse the trial court's decision if it was not supported by "competent, credible evidence going to all the essential elements of the case."    *Id.*, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.    In reviewing the evidence, "we will not disturb the choice made by the trier of fact between credible witnesses and their conflicting testimony unless it is so incredible that it defies belief."    *Fairborn v. Boles* (May 15, 1998), Greene App. No. 97 CA 110, unreported, 1998 WL 241823, at 3.

There are essentially three versions of the events that occurred in the Huffman Park men's restroom on the afternoon of July 9, 1996.    We will only review the facts relating to the two specifications that resulted in guilty findings by the civil service board.

In order to understand each version of the events, we must first give a brief description of the bathroom.    Just beside the entrance, there is a six-to-seven foot partial wall that one must walk around to enter the main part of the restroom.    Once inside, along one wall are two urinals, then two toilets, which are separated by about a three-and-a-half-foot partial wall.    The first version we will review is that of Detective Simpson, the park ranger who arrested Piper.

Simpson was working undercover in the park to investigate sexual activity in the restrooms.    At approximately 1:30 p.m., Simpson was in the restroom while another man was in the far stall.    The other man cleared his throat and Simpson took some toilet paper off the roll in the next stall, both actions apparently communicating interest in illicit sexual behavior.    When Simpson heard footsteps outside, he headed toward the door and walked out of the restroom just as Piper walked in.

Simpson stayed outside the restroom for approximately forty-five seconds and then reentered.    When he came back in, he witnessed Piper standing in front of the urinal massaging his penis, which was partially erect.    He and Piper made eye contact for several seconds.    Simpson then left the restroom again.    After approximately thirty seconds, Simpson reentered the restroom and saw Piper standing in front of the first toilet, but facing away, holding his erect penis with

one hand and wiping it off with toilet paper with the other. Simpson remained in the doorway where he could look outside and look into the restroom at the same time. When he completed wiping himself off, Piper threw the toilet paper into the commode. He then walked in a u-turn into the far stall and placed his penis into the other man's mouth. At this time, Simpson approached the two men and produced his badge, advising them they were under arrest.

Upon request, Piper gave his driver's license to Simpson, while the unknown man stated that his license was in his truck. The three men left the restroom and headed to the unknown man's truck to retrieve his I.D. During this walk, Piper continually asked Simpson to talk alone, while Simpson continually advised him that they would talk later, after he had obtained the unknown man's I.D. When the unknown man entered the cab of his pick-up truck, Piper produced his police I.D. to Simpson. While Simpson was looking at Piper's police I.D., the unknown man started his truck and sped away. Simpson and Piper chased him in Simpson's vehicle, but could not apprehend him.

When Simpson and Piper returned to the park, Simpson radioed for Internal Affairs to report to the scene. Upon hearing this broadcast, Sergeant Mannix, a friend and co-worker of Piper, came to the scene. When he arrived, he asked Piper what had happened. This is the version of events Mannix alleges that Piper relayed to him that day.

Piper had stopped by the park to review a file and look at a map before going out on an investigation. While he was sitting in the parking lot, he realized that he needed to use the restroom. He put his gun, badge and paperwork in the trunk and walked over to the restroom. As he was sitting on the toilet and was about to wipe off the end of his penis, the man in the stall next to him was mumbling something. In order to find out what the man was mumbling, Piper stood up, while his penis was still exposed, and walked around the wall to the other stall to ask him. Suddenly, "the guy grabbed him so fast and put his dick in his mouth that he didn't know what was going on." Instantly, Piper jumped back away from this man, but as this all happened, Simpson had walked back into the bathroom. He then approached Piper and the other man and advised them they were under arrest.

Piper's explanation is different from the other two versions of the events. He agrees that he had stopped at the park to review reports and a map before going to his next investigation. Before he left there, he decided to use the park restroom facilities. He placed his gun in his briefcase on the passenger seat and his badge on the visor, and locked the car. When he entered the restroom, there was a man standing outside, who he ultimately learned was Detective Simpson. Piper approached the urinal and unzipped his pants. At that moment, Simpson

walked into the restroom and stood right behind Piper and just looked at him. After a few seconds, Simpson walked back out.

Meanwhile, Piper had begun urinating when he heard another man in the furthest stall clear his throat. While Piper was still standing at the urinal, Simpson came back into the restroom and just stood and looked at Piper again. Piper turned his head a little and saw through his peripheral vision that it was the same man who had come in before. Then Simpson left the bathroom again.

At this point, Piper was getting a little concerned since he did not have his gun or badge. In his haste to complete urinating and get himself back together, he dripped urine on the underside of his penis, his pants, and his hand. He walked over to the first stall and took some toilet paper off the roll to wipe himself off. While he was throwing the toilet paper into the commode, the man in the far stall grabbed his penis. As soon as he felt the grab, Piper simultaneously looked down and jumped. The man was crouched down at the edge of the wall, apparently trying to put Piper's penis in his mouth. However, Piper is certain that the man's mouth never touched his penis.

At approximately the same time, Piper heard footsteps outside the bathroom. He looked toward the door and saw Simpson enter the bathroom, staring directly at Piper. He approached Piper at a very quick pace with his hand behind his back. Piper froze. When Simpson got close, he produced his badge and said, "I have seen enough, you are both under arrest."

Piper gave his driver's license to Simpson and then tried to get Simpson to leave the other subject in the restroom so that he could identify himself as a police officer. Simpson explained that he would listen to him after he received the other man's identification. The three men walked to the unknown man's truck to retrieve his license. During this walk, Piper continually urged Simpson to listen to him so he could identify himself as a police officer. Finally, when they reached the road, Piper just shoved his police I.D. in Simpson's face. Simpson said nothing. They were standing near the door of the unknown man's truck when he sped away.

After they were unable to recover the unknown man, Piper and Simpson returned to the park. On their way back, Simpson blamed Piper for the man's escape because he had distracted Simpson with his police identification. After they returned, Simpson contacted Internal Affairs and cited Piper with public indecency.

While on the stand, Piper denied telling Sergeant Mannix the story as relayed by Mannix. Instead, he claims that he told the story just as he did at the hearing, only using more colorful language. Piper had told Mannix that while he was sitting in the parking lot, he had to "use the shitter," where Mannix thought

he said he had to "take a shit." Piper claims that he told Mannix the man who grabbed him tried to "engulf" him in his mouth, but was unsuccessful, where Mannix relayed that the man actually had his mouth around Piper's penis.

Some other inconsistencies were the location of Piper's gun and conversation during the incident in the restroom. Piper claims that he placed his gun in his briefcase in the front of the car, while Mannix testified that Piper told him it was in the trunk. Mannix also testified that Piper and the unidentified man had conversation in the restroom prior to this incident, while Piper and Simpson both testified that there was no conversation.

During Piper's trial in Fairborn Municipal Court for public indecency, he made two statements that were the partial bases for Charge I, Specification IV, making false statements. First, Piper responded to a question that he had received no previous disciplinary action from the police department. Later, he revealed to Internal Affairs that he had had an oral reprimand reduced to writing fifteen years earlier. He explained at the civil service hearing that he really did not consider that to be disciplinary action because he was not suspended, demoted, docked pay, or anything similar.

The other statement related to his job duties with the Dayton Police Department. When questioned at trial whether he investigated sexual abuse cases, Piper responded "not in my investigations." During the civil service hearing, he clarified that although he had handled sexual abuse cases in the past, it was not one of his primary duties. Instead, he primarily handled child abuse and neglect, missing juveniles, kidnappings, child stealings, and juvenile assaults.

In addition to these statements, Piper was found guilty of Charge I, Specification IV, for making false statements about what actually occurred in the restroom on July 9, 1996. The activities in the restroom also form the basis for Charge I, Specification I, engaging in criminal behavior. Piper was found guilty of only these two specifications.

After reexamining our standard of review, we must give deference to the lower court's credibility assessment of the witnesses. We find that crediting Sergeant Mannix and/or Detective Simpson's testimony and not accepting Officer Piper's does not defy belief. Hence, we hold that the guilty findings entered by the civil service board and upheld by the trial court were supported by competent, credible evidence. Accordingly, Piper's second assignment of error is overruled.

█ Piper has alleged that the city of Dayton violated the collective bargaining agreement between the Fraternal Order of Police, John C. Post Lodge No. 44 Officers' Unit and the city of Dayton ("F.O.P. contract"). Under the F.O.P. contract, the city was required to institute disciplinary proceedings against Piper within sixty working days of the termination of any criminal proceedings related

to the incident requiring discipline. A jury found Piper not guilty of his public indecency charge on October 2, 1996, and by January 21, 1997, he had worked sixty days. However, the department did not serve Piper with formal charges until April 28, 1997.

The city maintains that the civil service board and the courts have no jurisdiction to consider the timing provision in the F.O.P. contract based on R.C. 4117.10(A) and the grievance arbitration provision of the F.O.P. contract. R.C. 4117.10(A) provides:

"An agreement between a public employer and an exclusive representative entered into pursuant to this chapter governs the wages, hours, and terms and conditions of public employment covered by the agreement. If the agreement provides for a final and binding arbitration of grievances, public employers, employees, and employee organizations are *subject solely to that grievance procedure* and the state personnel board of review or *civil service commissions have no jurisdiction to receive and determine any appeals relating to matters that were the subject of a final and binding grievance procedure.*" (Emphasis added.)

Article 22 of the F.O.P. contract describes the grievance procedure as a five-step process, culminating in binding arbitration. The purpose and definition portion of Article 22 states: "The procedures of this article shall serve as a means of settlement of all grievances. A grievance is a complaint that Management has violated this agreement, but does not include any complaint subject to appeal to the Civil Service Board." The city argues that because Piper's allegation that the city violated the timing provision could be considered a "grievance" under the F.O.P. contract, that it may be resolved solely through arbitration. We disagree.

The police chief and city manager, the civil service board and subsequently the court were faced with the question: "Was Piper properly disciplined?" Piper's discipline resulted from charges that he had violated several of the City of Dayton Civil Service Rules and Regulations, and the Dayton Police Department Rules of Conduct and Canons of Police Ethics. The rules of conduct specifically state that disciplinary action "will be in accordance with Civil Service Regulations, *any pertinent labor contract,* and any other pertinent rules of Departmental procedure." (Emphasis added.) The labor contract provides time limitations for instituting disciplinary charges. In answering the question of whether Piper was properly disciplined, particularly in light of this reference in the rules of conduct, we must consider whether the discipline was timely in accordance with the F.O.P. contract.

Contrary to the city's argument, the civil service board is not without jurisdiction to consider this question. First, the city relies heavily on the language in R.C. 4117.10(A) that the civil service board and courts "have *no*

*jurisdiction* to receive and determine any appeals relating to matters that *were* the subject of a final and binding grievance procedure." (Emphasis added.) The Eleventh and Fourth Districts interpreted this section of the statute as follows: "[T]he legislature through the foregoing language sought to prevent dual litigation through both an arbitration exercise and a separate appeal to a civil service commission." *In re Lemley–Wingo* (Aug. 22, 1990), Ross App. No. 1622, unreported, 1990 WL 127040, at 4, citing *Monico v. Girard Bd. of Edn.* (Dec. 4, 1987), Trumbull App. No. 3716, unreported, 1987 WL 26711, at 7. In these cases, as in the present case, because the grievance procedure was not utilized, the courts found that R.C. 4117.10(A) did not prohibit the civil service board's jurisdiction to interpret the labor contract in the context of the disciplinary action under consideration. *Id.* (remanding to the civil service board because the provision of the collective bargaining agreement allowing the city to discharge probationary employees without cause superceded the statute allowing discharge only for just cause); see, also, *Anderson v. Massillon* (Feb. 22, 1999), Stark App. No. 98–CA–00214, unreported, 1999 WL 174851 (finding the civil service board should have interpreted the labor contract because the contract did not allow probationary employees to appeal disciplinary action through the grievance process in the contract; therefore, their appeals must be allowed through civil service board).

In addition, the F.O.P. contract itself suggests that the civil service board may consider some contractual issues. As quoted previously, the purpose and definition of the grievance section states that a grievance does not include a complaint subject to review by the civil service board. Pursuant to R.C. 124.34, a police officer who appeals disciplinary action must do so through the civil service board. Neither party has challenged the board's jurisdiction to decide whether Piper's thirty-five-day suspension was appropriate. Consequently, the civil service board must necessarily consider whether the disciplinary action was timely as an inherent part of whether it was proper.

Based on the foregoing, we agree with Piper that the court and the civil service board should have considered whether the disciplinary action taken by the city was timely under the F.O.P. contract. Some evidence was presented at the hearing that the criminal investigation of Piper continued past the time of his acquittal for public indecency. Because this issue was not addressed below, the judgment of the trial court is reversed, and the cause is remanded to the civil service board for further proceedings in accord with law and consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

FAIN and GRADY, JJ., concur.